IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>UNITED PARK CITY MINES and TALISKER FINANCE LLC,<br><br>　　　　　Defendants. | **ORDER AND MEMORANDUM DECISION**<br><br>Case No. 2:17-cv-00482-TC<br><br>District Judge Tena Campbell |

Before the court is Plaintiff United States of America's motion for partial summary judgment. The United States asks the court to find that Defendants United Park City Mines Company (UPCM) and Talisker Finance LLC unreasonably failed to comply with two requests for information sent by the Environmental Protection Agency (EPA) under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9604(e). For the following reasons, the court DENIES the United States' motion.

## FACTUAL BACKGROUND

This motion "comprises one small part of a complex litigation landscape." United States v. Gurley, 235 F. Supp. 2d 797, 800 (W.D. Tenn. 2002). For over a hundred years, various companies, including UPCM, conducted mining operations at the 2,700-acre Richardson Flat Tailings Site in Summit County, Utah. Today, the Site is owned by UPCM. EPA became involved in the mid-1980s, and it divided the Site into four Operable Units (OUs)—OU1, OU2, OU3, and OU4—as part of its investigation into potential environmental contamination at the Site. The Site was indeed contaminated with mining waste. Over the ensuing thirty years, EPA

and UPCM entered into various agreements and worked together to clean up parts of the Site, focusing on OU1.  The partnership appeared to work.

In 2014, turning their collective attention to the rest of the Site, EPA and UPCM signed an Administrative Order on Consent, under which UPCM agreed to clean up OU2 and OU3 and pay EPA's future response costs.  These costs were projected to exceed $30 million.  UPCM had previously pledged its real property to secure a $150 million Wells Fargo loan to Talisker Finance.  Talisker Finance re-lent some of the loan proceeds to UPCM.  But Talisker Finance defaulted on the Wells Fargo loan, and consequently, in late 2015, UPCM's property was sold for $70 million.

Presumably concerned with UPCM's ability to pay for further cleanup at OU2 and OU3, EPA sent UPCM a CERCLA Section 104(e) request for information in January 2016.  The 104(e) request, which contained twenty questions, asked about UPCM's corporate history and sought documents such as tax returns, financial statements, contracts, balance sheets, and insurance policies.  A few weeks after receiving the 104(e) request, UPCM asked EPA to pause the 104(e) inquiry while UPCM formulated a business plan to prove that it could continue cleaning up the Site.  Unsurprisingly, EPA declined to withdraw its 104(e) request, but it gave UPCM extra time to respond to the questions.

By the May deadline, UPCM sent EPA a ten-page letter responding to the 104(e) request.  UPCM's letter is peppered with objections to nearly all of EPA's substantive questions.  Its objections can be summarized like this: EPA's questions are not relevant to UPCM's "ability to pay for or to perform a cleanup," "not appropriately limited to the Sites," and overall broad, indefinite, vague, and burdensome.  Days later, EPA told UPCM that its objections were unpersuasive and that its response was noncompliant.  Still, EPA met with UPCM in June to

discuss UPCM's business plan and other matters. In a follow-up letter, EPA reiterated that UPCM's business plan did not substitute for a complete response to the 104(e) request, and it gave UPCM fifteen days to provide financial documents and to narrow its objections.

By the July deadline, UPCM supplemented its initial 104(e) response with five batches of documents. This "First Supplemental Response" contained, among other things, UPCM's financial statements from 2012 to 2015, deeds, Wells Fargo loan documents, insurance policies, and settlement agreements. Two weeks later, after meeting with EPA again, UPCM provided more documents, along with a three-page letter. This "Second Supplemental Response" included parts of five consolidated tax returns from July 2010 to June 2015, along with financial statements from 2011 to 2015. The letter set out a "general summary of responsive information and materials" that UPCM had submitted, organized by 104(e) question, which purported to fully respond to EPA's 104(e) request. After reviewing the supplemental responses, EPA told UPCM that for seven of the 104(e) questions, UPCM's document production was deficient. EPA gave the company ten days to "cure the deficiencies," but UPCM did not do so, choosing instead to "stand on its objections" to those questions.

Where does Talisker Finance fit into the story? Less than a week after informing UPCM that it needed to cure its deficient document production, in September 2016, EPA sent a separate Section 104(e) request for information to Talisker Finance. The 104(e) request, which contained twelve questions, asked about Talisker Finance's corporate history and its relationship to UPCM and sought documents related to the Wells Fargo loan and Talisker Finance's re-lending of loan proceeds to UPCM. Talisker Finance responded by the October deadline, and it lodged many of the same general objections as UPCM. Even so, Talisker Finance did state that it "has been a borrower from Wells Fargo and a lender to [UPCM] and other entities," and that "there have

3

been no transfers of assets or liabilities" between it and UPCM. (Mot. Partial Summ. J. Ex. 22 at 8, ECF No. 72-23.) And in response to a question about re-lending loan proceeds, Talisker Finance attached about 100 pages of related loan documents.

EPA was unsatisfied with UPCM's and Talisker Finance's responses to the 104(e) requests, and so it notified both companies in March 2017 that the United States would be bringing an enforcement suit against them. Nothing changed. On May 30, 2017, the United States filed the present lawsuit on EPA's behalf.

In its complaint, the United States asked the court to compel UPCM and Talisker Finance to comply with the two 104(e) requests. (ECF No. 3.) The Defendants answered the complaint, (ECF Nos. 14–15), and discovery began. In early 2018, the parties cross-moved for summary judgment,[1] seeking to have the court establish the propriety of EPA's information requests as a preliminary matter. (ECF Nos. 24, 26.) Ruling on the briefs, the Honorable Dee Benson denied the Defendants' motion and granted the United States' motion. (ECF No. 43.) He held that EPA had authority to issue the 104(e) requests, that the requests were permissible, and that the Defendants had violated the statute. He then ordered the Defendants to comply within thirty days. The Defendants filed a notice of interlocutory appeal on July 30, 2018, and Judge Benson stayed the court's ruling pending the Tenth Circuit's decision. (ECF No. 50.)

Almost two years later, the Tenth Circuit affirmed Judge Benson's order, rejecting all the Defendants' arguments on appeal. The Tenth Circuit held that (1) it was reasonable for EPA to seek information from Talisker Finance because of its relationship with UPCM, (2) EPA's other motive of gathering evidence for an alter ego claim against Talisker Finance was not

---

[1] The United States' motion was for partial summary judgment, solely on the issue of the Defendants' liability for violating CERCLA Section 104(e). It asked the court to order the Defendants to fully comply with the 104(e) requests.

impermissible, (3) EPA's stated reasons for issuing the 104(e) requests were permissible, (4) EPA's 104(e) requests satisfied the Fourth Amendment's requirement that (a) information requests be within agency authority and (b) the information sought be relevant to carrying out CERCLA's purposes, (5) the district court did not err in ordering the Defendants to comply with all of the 104(e) requests, and (6) the district court's injunction did not violate Federal Rule of Civil Procedure 65.  See generally United States v. United Park City Mines Co., 827 F. App'x 871 (10th Cir. 2020).  On November 9, 2020, the Tenth Circuit issued its mandate and the case continued here.[2]

      Thirty days later, both Defendants supplemented their 104(e) responses.  Over the past year, the Defendants filed two motions for clarification, asking the court to define the scope of the now-lawful 104(e) requests.  The first motion, filed in December 2020, asked the court to clarify whether the Defendants had to provide current information in response to the 104(e) requests and whether they had to specifically identify responsive documents and information in response to each request.  (ECF No. 55.)  The court answered "yes" to both questions.  (ECF No. 65.)  The second motion, filed in July 2021, asked the court to clarify the definitions of "affiliated" and "Talisker Affiliate," terms that the 104(e) requests use.  (ECF No. 67.)  The court mostly agreed with the United States' definitions.  (ECF No. 83.)  While the second motion was pending, the United States filed the present motion, asking the court to find that the Defendants' noncompliance was unreasonable as a matter of law.  (ECF No. 72.)

## **LEGAL STANDARD**

      In general, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter

---

[2] Shortly after the Tenth Circuit mandate, Judge Benson died, and the case was reassigned to this court.

5

of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013) (quoting E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000)).

When evaluating a motion for summary judgment, the court must view the facts and draw all reasonable inferences in favor of the nonmoving party. Id. (quoting Turner v. Pub. Serv. Co., 563 F.3d 1136, 1142 (10th Cir. 2009)). But this is only true if "there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)). "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." Talley v. Time, Inc., 923 F.3d 878, 893–94 (10th Cir. 2019) (quoting Teets v. Great-W. Life & Annuity Ins. Co., 921 F.3d 1200, 1211 (10th Cir. 2019)).

## **ANALYSIS**

CERCLA empowers district courts to "assess a civil penalty not to exceed $25,000[3] for each day of noncompliance against any person who unreasonably fails to comply with" an EPA information request. 42 U.S.C. § 9604(e)(5)(B). To assess a penalty, the court must address the three issues outlined in the statute. First, the court must determine whether the party has failed to comply with an EPA information request—essentially, whether liability under Section 104(e)

---

[3] The statute reads "not to exceed $25,000 for each day," but EPA increased this amount by regulation. See Sackett v. E.P.A., 566 U.S. 120, 123 n.1 (2012); EPA Civil Monetary Penalty Inflation Adjustment, 85 Fed. Reg. 83818-01 (Dec. 23, 2020); 40 C.F.R. § 19.4 tbl. 1.

may accrue. If liability may accrue, the court must decide whether the party's failure to comply was unreasonable. If the failure to comply was unreasonable, the court must choose a dollar amount of daily civil penalties to impose. Judge Benson answered the first question in the affirmative, which the Tenth Circuit upheld. See ECF No. 43; United Park City Mines Co., 827 F. App'x at 883. Now the court must decide whether the Defendants' failure to comply was unreasonable.

To assess reasonableness under Section 104(e), courts use a two-part test. First, the United States must establish a prima facie case of unreasonable delay. Second, the Defendants must rebut the United States' case with affirmative defenses. See Gurley, 235 F. Supp. 2d at 803; United States v. Barkman, 784 F. Supp. 1181, 1187–88 (E.D. Pa. 1992); United States v. Martin, No. 99 C 1130, 2000 WL 1029188 (N.D. Ill. July 26, 2000). Once both sides have been heard, the court must decide whether the Defendants' excuses mitigate their noncompliance or otherwise render it reasonable. See United States v. Ponderosa Fibres of Am., Inc., 178 F. Supp. 2d 157, 161 (N.D.N.Y. 2001). Reasonableness is a fact-intensive inquiry, but complexity alone will not preclude summary judgment if there are no genuine disputes of material fact. See, e.g., id.

I. **The United States' Case for Unreasonableness**

The United States offers three reasons why the Defendants acted unreasonably. First, the sheer amount of time that has passed without compliance makes the Defendants' conduct unreasonable. Second, the Defendants' failure to provide complete responses is unreasonable. Third, the Defendants' "evasive and willful efforts to avoid responding to" the 104(e) requests are unreasonable. The court holds that the United States has made its prima facie case for unreasonableness.

7

Time itself helps make the United States' prima facie case, as the 104(e) requests were sent over five years ago. Several courts have held that late responses are presumptively unreasonable. See Martin, 2000 WL 1029188, at *8 (finding 607-day delay per se unreasonable); Barkman, 784 F. Supp. at 1187 ("Seven hundred plus days of delay is per se unreasonable and would ordinarily trigger the penalty provisions of CERCLA without further proof by the USA."); United States v. Timmons Corp., No. CIV103CV00951RFT, 2006 WL 314457, at *15–16 (N.D.N.Y. Feb. 8, 2006) (finding 1,300-day delay unreasonable as a matter of law). In comparison, UPCM's complete response is currently 2,046 days late, and Talisker Finance's complete response is currently 1,881 days late.[4] These substantial delays weigh in the United States' favor.

Further supporting the United States' prima facie case is the Defendants' pattern of failing to provide complete responses to and resisting EPA's 104(e) requests. After EPA extended UPCM's 2016 response deadline by sixty-one days, UPCM's response was terse. It did not attach any documents and did not answer most of EPA's questions. Its objections were broad and repetitive. UPCM's First and Second Supplemental Responses were similarly incomplete, both in terms of document production and substantive answers. Talisker Finance did not try all of UPCM's tactics, but it still failed to fully respond to EPA's 104(e) request, even though its 104(e) request contained fewer questions than UPCM's. Talisker Finance also lodged many of the same objections that UPCM used.

EPA told UPCM at least four times—on May 6, June 22, and September 6, 2016, and on March 28, 2017—that its responses were inadequate. It likewise informed Talisker Finance of its incomplete responses on March 28, 2017. Despite receiving many chances to cure their

---

[4] These numbers are current as of the date of this order (Dec. 8, 2021).

deficiencies, the Defendants stood on their objections. EPA inevitably had to resort to litigation to secure compliance, and over three years later, after the Tenth Circuit affirmed Judge Benson's summary judgment order, both Defendants finally turned over more information to EPA. Still, neither Defendant gave EPA all that it wanted. Both Defendants failed to supplement their responses to four questions, for example. Talisker Finance's February 2021 supplemental response left out many transactions that EPA knew about. Looking only at the United States' side of the story, the cumulative effect of these facts shows the Defendants' prima facie unreasonableness.

## II. The Defendants' Case for Reasonableness

The Defendants have plenty to say in response.[5] In essence, they argue that reasonableness is too fraught with factual issues to be decided on summary judgment. They break the five-year timeline into distinct periods and argue that for each period there are independent reasons why they did not fully comply with EPA's 104(e) requests. First, UPCM claims that its meet-and-confer efforts with EPA in 2016 were reasonable. Second, the Defendants argue that they had the right to "lodge and litigate objections" to the 104(e) requests. Third, they maintain that their responses were neither incomplete nor evasive. Finally, the Defendants assert that their recent motions for clarification were reasonable. The court finds that the Defendants have successfully rebutted the United States' prima facie case and created genuine disputes of material fact that preclude summary judgment.

To begin, it is common for courts to decide on summary judgment whether a defendant's noncompliance with a 104(e) request was unreasonable. E.g., United States v. 718 W. Wilson

---

[5] This is partially because the court allowed the Defendants to file an opposition memorandum nearly double the length allowed by the Local Rules. (ECF No. 85.)

9

Ave., 778 F. Supp. 2d 1067, 1072–73 (C.D. Cal. 2011); Ponderosa, 178 F. Supp. 2d at 161–64; Martin, 2000 WL 1029188, at *8; see also United States v. M. Genzale Plating, Inc., 807 F. Supp. 937, 938 (E.D.N.Y. 1992) (stating that the court had granted the government's motion for partial summary judgment on the unreasonableness of the defendants' noncompliance with an EPA order). The Defendants cite United States v. Moore in arguing that Section 104(e) reasonableness is "ill-suited" for summary judgment. 703 F. Supp. 460, 463 (E.D. Va. 1988). The Moore court brusquely denied the government's partial summary judgment motion, pointing to the government's slowness in bringing the suit and the "very little evidence" that had been submitted. Neither of those problems exists here, where the United States brought its case swiftly and where the record is immense. Whether the court can grant summary judgment depends on whether the Defendants successfully raise triable questions of fact or otherwise show that the United States is not entitled to judgment as a matter of law.

  A. UPCM's Business Plan

  The Defendants first argue that it was reasonable for UPCM to try to "work with" EPA instead of immediately complying, based on "their long history of successful collaboration." (Opp'n at 68, ECF No. 91.) Rather than answer the information request on time, UPCM created a thirty-six-page presentation to show EPA that it was "capable of performing the work." (Id.; Mot. Ex. 12, ECF No. 72-12.) EPA later told UPCM that its "business plan" was no substitute for full compliance.

  UPCM may well have acted unreasonably in pursuing its business plan. But because EPA moved UPCM's response deadline to May 2, 2016, the events that preceded this date—including pursuing the business plan—are not relevant here. Only unreasonable noncompliance with a 104(e) request can support a civil penalty. See 42 U.S.C. § 9604(e)(5). The court lacks

the authority to penalize UPCM for its behavior before it had to respond to the request—before it had an opportunity to either comply or to fail to comply. As a result, UPCM cannot be penalized for its behavior before May 2, 2016.

    B.  Lodging and Litigating Objections

The Defendants next argue that they were asserting the right to "lodge and litigate objections." Asserting an "objectively reasonable justification for refusing to respond" stems imposing civil penalties under CERCLA. United States v. Charles George Trucking Co., 823 F.2d 685, 691 (1st Cir. 1987); United States v. Gen. Laminates, Inc., No. 89-497-CIV-J-12, 1990 WL 358299, at *3 (M.D. Fla. June 27, 1990). EPA said so itself in the 104(e) requests sent to the Defendants. (Mot. Ex. 1 at 2, ECF No. 72-1; Mot. Ex. 20 at 2, ECF No. 72-21 ("Failure . . . to adequately justify your failure to respond[] can result in . . . the imposition of penalties . . . .").) If the Defendants' objections were reasonable, their noncompliance while asserting and litigating those objections must also be reasonable.

The Defendants' objections concerned the relevance and scope of EPA's 104(e) requests. The Defendants argued that EPA's questions were not relevant to UPCM's "ability to pay for or to perform a cleanup," "not appropriately limited to the Sites," and overall broad, indefinite, vague, and burdensome. These were certainly blanket objections, but it is unclear that lodging them was unreasonable. On the contrary, these are exactly the kinds of reasonable objections that the Defendants could have made. See Charles George Trucking, 823 F.2d at 691 (citing as an example of an objectively reasonable justification, "a [plausible] claim that the EPA's information demand was either a nullity or otherwise unenforceable").

None of the United States' caselaw is analogous here. The court in Ponderosa Fibres of America found that the defendant acted unreasonably when it received a 104(e) request and

ignored it for ninety-seven days. 178 F. Supp. 2d at 161. Similarly, the Martin court found that the defendant acted unreasonably when he received a 104(e) request and ignored it for 607 days. 2000 WL 1029188, at *3. Still similarly, in Timmons Corp., the court found that the defendants acted unreasonably when they received a 104(e) request and ignored it for three years. 2006 WL 314457, at *16. In Gurley, the court found clear unreasonableness when the defendant refused to accept delivery of EPA's 104(e) request for 200 days and ignored the request for another 200 days. 235 F. Supp. 2d at 803. Finally, in Barkman, there were two 104(e) requests. The defendant ignored EPA's first 104(e) request for 160 days, and although the defendant provided timely responsive information to a second 104(e) request, he explicitly did not object to the substance of either request. The court found that the overall delay was unreasonable. 784 F. Supp. at 1189.

The lesson to be drawn from these examples is that ignoring EPA's communications, refusing to respond, and not complying plus failing to lodge objections are unreasonable as a matter of law. That is not what the Defendants did here. Not only did they submit their answers to the 104(e) requests on time, but they also gave reasons why they refused to answer certain questions.[6] EPA's judgment about the quality of the Defendants' objections cannot substitute for the court's judgment. The Defendants were in near-constant communication with EPA throughout the process. When the litigation began, the parties agreed to cross-move for summary judgment to quickly resolve the propriety of EPA's 104(e) requests. A quick interlocutory appeal followed, and the Defendants supplemented their responses by the new

---

[6] Plus, none of the cases involved litigation as extensive as in this suit. Instead, these cases involved defendants whose behavior could only fairly be described as recalcitrant.

deadline. The United States has not shown how such behavior can be unreasonable as a matter of law, so it has not satisfied its burden on summary judgment here.

It is also unclear whether the Defendants had any avenue to litigate their objections other than waiting for EPA to sue and defending themselves in federal court. After all, CERCLA prohibits preemptive lawsuits from potentially responsible parties. See 42 U.S.C. § 9613(h) ("No Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action selected under section 9604 of this title."); United States v. Cohen, 914 F. Supp. 252, 254 (N.D. Ill. 1996) (dismissing under § 9613(h) a counterclaim that asked the court to declare that the defendants did not have to respond to an EPA information request). If the Defendants could have preemptively sued EPA to obtain a declaratory judgment or other remedy, perhaps their objections could be framed as unreasonable obstinance. Again, the court—not EPA—is the arbiter of reasonableness. The court therefore gives little weight to EPA's rejection of the Defendants' objections.

The remaining elephant in the room is the extraordinary length of time that has passed since the Defendants' responses were first due. It far surpasses the time periods that some courts have found presumptively unreasonable. See Martin, 2000 WL 1029188, at *8 (607-day delay); Barkman, 784 F. Supp. at 1187 (700-plus-day delay); Timmons Corp., 2006 WL 314457, at *15–16 (1,300-day delay). That said, those delays should be construed based on the overall unreasonableness present in each case, as identified above. In all three cases, the defendants ignored the EPA outright, failed to object to the 104(e) requests, or both. They were thus held responsible for the delays. Here, the picture is not quite so clear—certainly not clear enough for summary judgment. Much of the parties' time was spent waiting on the court to rule on their motions. (For example, the clock is running even now.) The case was on appeal for over two

years, during which the United States experienced a government shutdown and consequently agreed not to seek penalties for shutdown-related briefing delays.  (Opp'n Ex. B-20, ECF No. 88-5.)  Because parsing through the timeline shows that the Defendants cannot fairly be blamed for all these delays, the delays alone are not enough for per se unreasonableness.

        C.   The Defendants' 104(e) Responses

Next, the Defendants claim that after accounting for their reasonable objections, their responses were never incomplete or evasive.  The court does not see any evasiveness here.  Evasive means "[t]ending or seeking to evade; elusive; shifting."  Black's Law Dictionary (11th ed. 2019).  The only court to even discuss potential evasiveness was Gurley, when the defendant used "evasive tactics in refusing to accept the information requests," which required EPA to "spend an inordinate amount of time trying to track him down."  235 F. Supp. 2d at 807.  Such a clear-cut, extreme example of noncompliance is simply not present here.

Even so, the United States' argument turns more on the Defendants' allegedly incomplete responses, not any alleged evasiveness.  With the benefit of hindsight, along with several court orders, a Tenth Circuit ruling, and extensive document production, it looks like the Defendants' 104(e) responses may have been incomplete throughout the process.  Some of that can be attributed to legitimate reasons, like objections to the propriety of EPA's 104(e) requests (answered by the court and affirmed by the Tenth Circuit) or questions about the scope of those requests (answered in two orders on motions for clarification).  But as the United States points out, even barring objections or motions for clarification, at times the Defendants failed to fully respond to a question or fully produce documents that would respond to a question.[7]

---

[7] The United States also identifies that the Defendants violated various 104(e) procedural requirements, like not identifying the documents provided by question, or not accompanying their responses with a notarized certificate. These minute technical errors have little bearing on the reasonableness of the Defendants' behavior.

14

For UPCM, this is evident from the United States' reply memorandum on pages 29 through 32. In its Second Supplemental Response, UPCM did not provide all portions of its consolidated tax returns, did not provide copies of its general ledgers, trial balances, bank statements, and the Amended and Restated Loan Agreement, and omitted transfers between UPCM and Talisker Finance. Even after the Tenth Circuit mandate, UPCM did not provide its general ledgers, trial balances, bank statements, or the Amended and Restated Loan Agreement. Although EPA received these documents from other sources, it has the authority to seek information that it already possesses, so there is no excuse for failing to fully comply. See Gurley, 235 F. Supp. 2d at 804 (citing Barkman, 784 F. Supp. at 1189).

The United States reveals Talisker Finance's incomplete responses on pages 35 through 37 of the reply memorandum. By its original October 2016 deadline, Talisker Finance did not provide all the Intercompany Loan Documents, did not provide various Wells Fargo loan proceed documents related to UPCM, and made false statements about asset and liability transfers between Talisker Finance and UPCM. Even after it responded again in February 2021, Talisker Finance did not provide copies of documents relating to transfers between Talisker Finance and UPCM and did not provide the Wells Fargo loan proceed documents related to UPCM.

In its opposition and at the hearing, the Defendants argue that these examples of incomplete responses are red herrings. If, for example, a certain document is not responsive to a question, that document being missing does not make the response incomplete. This alone is a disputed issue of fact precluding summary judgment. Even assuming the United States' examples are accurate, only unreasonable noncompliance can result in monetary penalties, and incomplete responses are not necessarily unreasonable responses. Viewing these events of

noncompliance in the big picture—i.e., considering the Defendants objected to the requests and timely sought answers from the court and the Tenth Circuit, all while they produced documents and answers at each step—the court cannot definitively say that the Defendants acted unreasonably. Successfully showing that the Defendants failed to fully respond or justify their noncompliance at times does not relieve the United States of its summary judgment burden. Ultimately, material factual issues—whether certain responses were incomplete, for example—remain in dispute.

### D.  Motions for Clarification

The Defendants finally argue that after the Tenth Circuit affirmed Judge Benson's order, they timely sought the court's help in resolving disagreements over the temporal scope of the 104(e) requests and over the definition of the word "affiliated." Though the court sided with the United States both times, the Defendants argue that their positions were reasonable. The court agrees with the Defendants. As the court pointed out in its order on the Defendants' first motion for clarification, the court's role is to tell the Defendants "exactly how to comply with the Order" by clarifying the scope of the 104(e) requests. (Order at 3, ECF No. 65.)

The Defendants never advocated for any unreasonable positions in their motions for clarification. The second motion—about the breadth of the word "affiliated"—was a close question. The Defendants presented strong arguments to support their understanding of affiliation. Because there was a dearth of caselaw on the subject, the court had to examine various primary and secondary sources to craft an answer. United States v. United Park City Mines Co., No. 2:17-cv-482-TC, 2021 WL 3862082 (D. Utah Aug. 30, 2021) (to be published in F. Supp. 3d). Although these motions could be construed as intentionally delaying the Defendants' full compliance, the court "must view the facts and draw all reasonable inferences in

favor of the nonmoving party"—here, the Defendants. Tabor, 703 F.3d at 1215 (quoting Turner, 563 F.3d at 1142). Between December 7, 2020, and August 30, 2021, the Defendants did not act unreasonably in seeking clarification from the court.

## CONCLUSION

Because the United States has not established that the Defendants were unreasonable as a matter of law, the court DENIES the United States' motion for partial summary judgment. Whether the Defendants' noncompliance was unreasonable must be decided after a bench trial. The court will refer this case to a United States Magistrate Judge to set a trial date, pretrial conference dates, and deadlines for Rule 26(a)(3) pretrial disclosures and objections.

DATED this 8th day of December, 2021.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
United States District Judge